**IN THE UNITED STATE DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| DAVID COOK, M.D., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, and ROBERT WILKIE, the Secretary of the United States Department of Veterans Affairs, <br><br> Defendants. | Case No: 19-cv-02119-CSB-EIL |

**PLAINTIFF'S BRIEF IN SUPPORT OF**
**COMPLAINT FOR JUDICIAL REVIEW**

Plaintiff, David Cook, M.D. ("Dr. Cook"), by his attorneys, Goldberg Law Group, LLC, files this Brief in Support of Complaint for Judicial Review against the United States Department of Veteran Affairs and its Secretary, Robert Wilkie.

**NATURE OF THE ACTION**

Dr. Cook is a primary care physician who was employed pursuant to 38 U.S.C. § 7401(1) by the Veterans Administration ("VA") at the Decatur Community Based Outpatient Clinic ("the Decatur Clinic") run by VA Illiana Healthcare System from June 1, 2014 until November 4, 2018, when he was removed from federal employment and his privileges were revoked. (299, 307, 324)[1]. This action resulted after Dr. Cook had a brief personal relationship with a woman, who unbeknownst to him at the time, was a patient of the Decatur Clinic. (308). Dr. Cook appealed the decision removing him from federal employment to the Disciplinary Appeals Board ("DAB").

---

[1] Citations herein are to the administrative record which is bates labeled "DC DAB 0000_". The phrase "DC DAB" and zeroes at the beginning of each bates numbers are omitted.

1

(303). Gross violations of Dr. Cook's due process rights occurred during the DAB hearing, including the improper admission of unreliable hearsay statements by the patient that Dr. Cook was unable to cross examine and that the DAB relied upon in sustaining the decision to remove Dr. Cook from federal employment. For the reasons set forth herein, the decision must be reversed.

## PROCEDURAL HISTORY & FACTUAL BACKGROUND

Dr. Cook was a primary care physician at the Decatur Clinic from June 1, 2014 to November 4, 2018. (307). The VA assigns patients to specific primary care providers. (324). Dr. Cook had over 900 patients assigned to him. (441).

On January 20, 2017, Dr. Cook conducted a routine health exam on a patient who is hereinafter referred to as "Patient A". (233). Dr. Cook had no prior interactions with Patient A as she had previously received medical care and services from another health care provider at the Decatur Clinic. (481-482). Dr. Cook did not see or communicate with Patient A thereafter until September 11, 2017. (482).

On September 11, 2017, Dr. Cook received a message from Patient A through the internet dating service known as Match.com. (483; 957) Dr. Cook did not recognize Patient A as a current or former patient and Patient A did not identify herself as such. (25; 487). Dr. Cook and Patient A exchanged electronic messages through Match.com and agreed to meet the same day for a date. (500-501).

Upon meeting Patient A in person, Dr. Cook did not recognize Patient A as a current or former patient. (487). During their date, Dr. Cook and Patient A engaged in sexual relations. (491). Soon thereafter, Patient A informed Dr. Cook for the first time that she was assigned to his patient panel at the Decatur Clinic. (487; 493). Patient A further informed Dr. Cook that she had an appointment scheduled with him in the upcoming days. (487). In response, Dr. Cook told Patient

A that he could not be her physician and her boyfriend. (488). After September 11, 2017, Patient A and Dr. Cook had no further sexual relations. (488).

On September 13, 2017, Patient A presented to the Decatur Clinic for her appointment with Dr. Cook. (489). Due to perceived administrative hurdles imposed by the VA with removing patients from provider panels, Dr. Cook conducted Patient A's appointment at the Decatur Clinic. (498). After the September 13, 2017 office visit, Dr. Cook once again informed Patient A that he could not be her boyfriend and her physician, and suggested that she be reassigned to another physician. (488). Patient A indicated to Dr. Cook that she did not want to be assigned to another physician, because she felt most comfortable with him (25; 26; 200). After September 13, 2017, Dr. Cook and Patient A interacted socially on a few occasions but discontinued any further personal relationship after September 23, 2017. (491; 503-505, 506).

After September 23, 2017, Patient A contacted Dr. Cook directly through Facebook messenger with intermittent requests about medication refills. (490-491). Because Dr. Cook was still Patient A's assigned physician at the Decatur Clinic, he responded to Patient A's messages and refilled her medications. (200).

Almost a year later, in September 2018, Patient A reported to a VA Social Worker, Elizabeth McGarry ("McGarry"), that Dr. Cook contacted her through a dating website known as Plenty of Fish about a week after her appointment with him on September 13, 2017. (118). Patient A thereafter created and posted a YouTube video in which she publicly represented that Dr. Cook had asked her out after her appointment on September 13, 2017. (34; 119) As a result, the VA initiated a "fact finding" by the Administrative Board of Investigation ("AIB"), removed him from active duty, and suspended Dr. Cook's privileges on September 20, 2018. (251-252). On October

3

5, 2018, after completing its investigation, the AIB recommended "appropriate disciplinary or other administrative action" of Dr. Cook. (95-102).

On October 9, 2018, the Special Credential Professional Standards Board conducted a summary suspension review and recommended revocation of Dr. Cook's credentials and privileges. (37). On October 18, 2018, the Chief of Staff of the VA Illiana Health Care System notified Dr. Cook that he intended to remove Dr. Cook from federal service and revoke his clinical privileges for inappropriate conduct and failure to follow policy. (29-32). On October 30, 2018, the Acting Medical Center Director of the VA Illiana Health Care System sustained the charges and removed Dr. Cook from federal service with an effective date of November 4, 2018 for inappropriate conduct and failure to follow policy. (4-6).

Dr. Cook requested an appeal to the Disciplinary Appeals Board ("DAB"), and a hearing was held on January 8, 2019. (311). Patient A did not testify at the hearing and was not subject to cross examination by Dr. Cook. (313). Rather, statements made by Patient A were repeatedly admitted into evidence and considered by the DAB in the form of hearsay. For example, Patient A's statements to McGarry, the Social Worker, who also did not testify at the hearing, were introduced into evidence over Dr. Cook's objection through notes prepared by McGarry and through her AIB testimony. (334-336.) The DAB further allowed the Chief of Staff of the VA Illiana Health Care System and a Patient Advocate to testify as to their conversations with Patient A. (322; 347-349; 404; 415-416). The DAB also reviewed Patient A's YouTube video in advance of the hearing. (327-328).

The DAB sustained the decision to remove Dr. Cook from federal employment and revoke his privileges on February 12, 2019. (310). On March 14, 2019, the Acting Principal Deputy Under Secretary for Health approved and executed the decision of the DAB. (310).

# ARGUMENT

## I. STANDARD OF REVIEW

The Court has jurisdiction to review the decision of the DAB for the Veterans Health Administration under 38 U.S.C. §7462(f)(2), which provides that the action and findings of the DAB may, upon a review of the record, be reversed where they are: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule, or regulation having been followed; or (C) unsupported by substantial evidence.

To determine if an agency's decision is arbitrary and capricious, a reviewing court must determine whether the agency "set forth clearly the grounds on which it acted." *People of State of Ill. v. U.S.*, 666 F.2d 1066, 1073 (7th Cir. 1981), *quoting Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 807. "Under the arbitrary and capricious standard, the scope of […] review, although relatively narrow, is to be 'searching and careful.'" *Bowman Transp. v. Arkansas-Best Freight System*, 419 U.S. 281, 285 (1974). A reviewing court cannot substitute its judgment for that of the agency, but it must consider whether the agency's decision "was based on a consideration of the relevant factors and whether there were any clear errors of judgment." *Id.*, *quoting Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict...." *Jackson v. Veterans Admin.*, 768 F.2d 1325, 1329 (Fed. Cir. 1985) (quotations and citations omitted).

## II. THE DECISION OF THE DAB MUST BE REVERSED BECAUSE DR. COOK WAS DENIED DUE PROCESS THROUGH THE INTRODUCTION OF HEARSAY FROM THE COMPLAINANT, WHO WAS NOT SUBJECT TO CROSS-EXAMINATION.

The VA violated Dr. Cook's due process rights through the improper admission of unreliable hearsay statements from Patient A, who was not subject to cross examination. "Physicians hired permanently under 38 U.S.C. §7401(1) are statutorily entitled to due process procedures when they face an adverse employment action, such as suspension or revocation of privileges. See 38 U.S.C. §§ 7461–64 (listing procedural requirements, including a Disciplinary Review Board, to which persons hired permanently under 38 U.S.C. § 7401(1) are entitled)." *Qian v. Shinseki*, 747 F. Supp. 2d 1362 (S.D. Fla. 2010). The Constitution protects such public employees from being fired without due process of law. *Carmody v. Bd. Of Trs. Of the Univ. of Ill.*, 747 F.3d 470, 474 (7th Cir. 2014). The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (*quoting Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Patient A's hearsay statements were first introduced during the AIB investigation, which consisted of interviews with Dr. Cook (39-71), McGarry (72-88; 984-986) and the Patient Advocate, Teresa Seymour ("Seymour") (89-93; 987-992), as well as a review of McGarry and Seymour's written summaries of their conversations with Patient A. Patient A was not interviewed as part of the AIB investigation. Yet, the AIB allowed both McGarry and Seymour to testify extensively about Patient A's statements to them. The AIB also reviewed McGarry and Seymour's written summary of their conversations with Patient A. This hearsay was relied upon by the AIB to support its recommendation of disciplinary action against Dr. Cook, despite the fact that McGarry and Seymour's testimony, as explained further below, showed material discrepancies in Patient A's account of the events. (95-102).

In addition, Patient A did not testify at the DAB hearing. Yet, her statements, as portrayed in McGarry and Seymour's AIB testimony and written reports, were admitted into evidence at the

DAB hearing over Dr. Cook's objection. (319-320; 335-340). Additionally, other witnesses, who had only second-hand knowledge of Patient A's statements, were permitted to testify regarding their understanding of Patient A's story, resulting in the admission of multiple levels of hearsay testimony at the hearing. For example, the Chief of Staff, Dean Shoucair, D.O. testified,

> "[f]rom reading through the e-mails and the other information that you had just alluded to and the evidence file, the patient contacted the social worker Mrs. McGarry to make a complaint about Dr. Cook. She had indicated that approximately a year prior she had an intimate relationship with Dr. Cook, that she – that it was a consensual relationship between the two of them. That they met on September 13 for a face-to-face doctor/patient visit. And approximately a week later she was contacted by Dr. Cook…" (338).

This testimony was based on Dr. Shoucair's understanding of McGarry's report, which was based on statements conveyed by Patient A to McGarry. Rather than call McGarry to testify as to her encounters with Patient A or call Patient A as a witness to testify as to her own account of events, the VA relied upon hearsay within hearsay to establish disputed facts.

McGarry also did not testify at the DAB hearing and was not available for cross-examination. (333). McGarry was supposed to testify at the hearing, but the VA claimed her new employer would not permit her to do so, and the VA did not have subpoena power. (337). However, no evidence or affidavit was provided to support this claim. Despite the fact that McGarry did not testify, her reports and AIB interview transcript were admitted and considered by the DAB members, without Dr. Cook being afforded the opportunity to cross-examine McGarry.

Although Seymour testified at the DAB hearing and was subject to cross-examination, her testimony was not without issue. Numerous hearsay statements were improperly permitted through her testimony, particularly those based on her conversation with McGarry and Patient A, both whom did not testify at the hearing. (414-416).

The DAB relied upon the hearsay contained within McGarry and Seymour's written reports and AIB interviews, as well as Seymour's testimony in reaching its decision. However, as outlined below, this hearsay should not have been admitted or considered by the DAB because it lacked probative value and had no indicia of reliability.

McGarry acknowledged the unreliability of Patient A's hearsay statement's in her AIB interview, wherein she stated that she "didn't ask [Patient A] a lot of inquiring questions after [Patient A] gave me the information… I didn't ask any like details or investigative type questioning." (76). McGarry also acknowledged inconsistency in Patient A's account of events:

> "I can say that she has been, there has been a little bit of discrepancy in that she stated it was right after, but it was like within the week following her appointment. But she didn't have a clear picture of when the appointment was because in our first session, she said something about last summer, then she said last fall. So there was a little bit of discrepancy on her part exactly when that, when they had her initial appointment and then when they started talking thereafter." (76).

Where hearsay statements do not contain indicia of reliability, they cannot constitute substantial evidence. "To constitute substantial evidence, hearsay declarations, like any other evidence, must meet minimum criteria for admissibility it must have probative value and bear indicia of reliability." *Calhoun v. Bailar*, 626 F.2d 145, 149 (9th Cir. 1980). Patient A's hearsay testimony does not bear any indicia of reliability where the record reflects numerous discrepancies in her version of events, and where evidence produced by Dr. Cook indisputably refute those statements. (42; 76; 481; 501-504; 8). A DAB decision must be reversed when it is not supported by substantial evidence. 38 U.S.C. § 7462(f)(2).

More significantly, the admission of Patient A's hearsay violated Dr. Cook's due process rights where there were material factual disputes in the record and Dr. Cook was unable to cross examine Patient A. According to Seymour's report, "Patient stated she first saw Dr. Cook on

8

September 13, 2017 at Decatur." (115). Yet, according to McGarry's report: "She disclosed that about a year ago she had gone on a date and had sex with Dr Cook, her PCP. She had been to see Dr. Cook for a yearly exam." (118-120). In her YouTube video, Patient A described the first time she saw Dr. Cook as occurring during a health examination in January 2017. (967, 233, 240).

There were also material factual disputes about how and when Patient A and Dr. Cook's first personal contact occurred. According to Seymour's report, "Patient stated she first saw Dr. Cook on September 13, 2017 at Decatur. About a week later she received a message from a dating site to meet up with a potential partner. When she went to meet him it was Dr. Cook." (115). According to McGarry's report, "She had been to see Dr. Cook for a yearly exam. A couple of days later she received contact from him through a dating app called Plenty of Fish." (118). However, in her YouTube video, Patient A stated, "I started dating and I think I was on match and I got a message from a guy who was 50…. And then I look at his face and I realize it's my doctor. My doctor…that I hadn't seen since the last time he gave me a pap smear and a breast exam…But we talked a little bit and he's like well, I see you have a doctor's visit coming up here soon and I was like oh yeah it's in a week." (966-970). Dr. Cook testified that his first personal contact with the patient was through Match.com on September 11, 2017. (42). He "received a notification through Match that she had sent me a message." (483). The Match.com notification produced by Dr. Cook showed that he did in fact receive a message from Patient A on September 11, 2017. (957).

Additionally, there are inconsistencies concerning the time period between their first online contact and their first date. According to McGarry's report, "They began talking and the following weekend they went on a date…So there was a little bit of discrepancy on her part exactly when that, when they had her initial appointment and then when they started talking thereafter…They

9

talked for about a week and then they went on the date that weekend…" (118). According to Seymour's AIB interview, "…she said that they had met a week after she had saw him in September as a doctor/patient relationship." (90). Yet, Dr. Cook testified that they went on their date on September 11 or 12, 2017, before her appointment on September 13, 2017. (508).

There is also conflicting information on the location of their first date. According to Patient A, they met first at a park and then went to Dr. Cook's house. (115). In other accounts, Patient A reports that she went straight to Dr. Cook's house. (968-969). In contrast, Dr. Cook testified that they met near her house and then went to her house. (501). Dr. Cook further testified, "After that first meeting that we had the intimate encounter, I ended the physical relationship. I made it strictly platonic. We would talk we went to my house. We were, tried to do glass work which is a hobby of mine." (504).

In addition, the DAB was improperly allowed to review Patient A's YouTube video in advance of the hearing in violation of his due process rights. (327). It was improper for the DAB members to review the YouTube video prior to the hearing, which consisted of only Patient A's version of events, as it enabled the DAB to formulate opinions about Dr. Cook and the matter under review before he was able to be heard in a meaningful way. The DAB's consideration of the YouTube video also violated Dr. Cook's due process rights because the maker of the video, Patient A, did not testify at the hearing and was not subject to cross-examination.

The widespread admission of hearsay statements during the hearing and review of the YouTube video prior to the hearing is a violation of Dr. Cook's right to due process, particularly where the hearsay was was relied upon by the DAB to support its decision that the VA's charges against Dr. Cook were supported by substantial evidence.

**III.   THE DAB'S FINDINGS ARE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.**

The DAB's findings were contrary to the manifest weight of the evidence, where Dr. Cook presented documentary evidence showing that Patient A's statements were not truthful; where there was no evidence that Dr. Cook had knowledge that Patient A was an assigned patient prior to their relationship; and where the evidence failed to show that Dr. Cook disclosed protected health information through Facebook messages with Patient A. Where the DAB's findings are contrary to the manifest weight of the evidence, the decision must be reversed. 38 U.S.C. §7462(f)(2)(C).

The first charge against Dr. Cook was for inappropriate conduct. (305). The VA divided this charge into three specifications. *Id*. The first specification alleged that Dr. Cook violated MCM 05-07 Employee Conduct and Ethical Standards, Part III, Section A, paragraph 3, which states, "The employee will not initiate or participate in any relationship with patients which could be harmful to the therapeutic environment for the specific patient or resulting in a non-therapeutic environment for other veterans in the same area." *Id*. The DAB found it undisputed that Dr. Cook had a personal relationship with Patient between September 11 and September 23, 2017 in violation of agency regulations. (306)

However, the DAB's finding is not supported by substantial evidence because the record shows that: (1) Dr. Cook did not initiate a personal relationship with Patient A. Rather, Patient A initiated contact with Dr. Cook via Match.com on September 11, 2017 (42, 47, 482-83); (2) at the time that Dr. Cook and Patient A had a personal relationship, Dr. Cook was unaware of the fact that she was a patient (42, 47, 52-53, 54-55, 56, 487-88, 493); (3) Patient A disclosed to Dr. Cook that she was a patient only after they had sexual relations on September 11, 2017 (45-46); (4) after Patient A identified herself as a patient, Dr. Cook had no further sexual contact with the patient and took steps to immediately end their relationship (45-46, 488, 491); (5) Dr. Cook's limited

11

contact with Patient A following September 13, 2017 was not sexual; and (6) MCM 05-07, Part III, Section A, subparagraph 1(e) states that relationships existing independent of the admission of the veteran to the facility do not constitute a prohibited relationship. (133).

The second specification alleged a violation of MCM 05-07 Employee Conduct and Ethical Standards, Part III, Section A which states, "Behaviors which could result in abuse, carelessness in rendering service, or a violation of instructions will not be tolerated. Specific behaviors referred to include, but are not limited to, emotional involvement with patients, sexual involvement with patients, and financial involvement with patients…" (306). The DAB found it undisputed that Dr. Cook had sexual relations with Patient A on or about September 11, 2017. *Id*.

This finding is not supported by substantial evidence because: (1) at the time that Dr. Cook and Patient A had sexual relations, Dr. Cook was unaware of the fact that she was a patient (42, 47, 52-53, 54-55, 56, 487-88); (2) Dr. Cook testified that he was aware of his ethical obligation to not to have sexual involvement with patients and that had he known Patient A was in fact a patient, he would not have agreed to go on the date (47); (3) Patient A disclosed to Dr. Cook that she was a patient only after they had sexual relations on September 11, 2017 (45-46); (4) after Patient A identified herself as a patient, Dr. Cook had no further sexual contact with the patient and ended their dating relationship (45-46, 488, 491); and (5) MCM 05-07, Part III, Section A, subparagraph 1(e) states that relationships existing independent of the admission of the veteran to the facility do not constitute a prohibited relationship. (133).

The third specification alleged that Dr. Cook contacted Patient A after being removed from duty on September 20, 2018. (306). The DAB found it undisputed that Dr. Cook contacted the patient by phone and Facebook after receiving notice of the investigation on September 20, 2018. However, this finding is not supported because (1) the VA cited no policy indicating that Dr.

Cook's behavior was inappropriate conduct under the circumstances (306); (2) Dr. Cook was removed from active duty without being given any explanation as to the reason for the removal (50-52, 255, 491-92); (3) later the same day, a nurse in the Decatur Clinic informed Dr. Cook that the patient had created a YouTube video about their relationship (52, 491-92); and (4) the written notice of "fact finding" given to Dr. Cook did not state the reason for the fact finding or put Dr. Cook on notice that he should not contact the patient (255).

The second charge against Dr. Cook was for "failure to follow policy." (307). This charge contained only one alleged specification, that Dr. Cook failed to safeguard Patient A's PHI from unauthorized disclosure through use of encryption software in violation of VA Handbook 6500, Appendix D, Paragraph 2, Subparagraph b.13. (307). The DAB found that Dr. Cook received medication refill requests from Patient A via Facebook, and that he admitted before the DAB that the Facebook messages contained identifying information that would be considered PHI. (307).

However, this finding is not supported because Dr. Cook did not initiate any communications with Patient A containing PHI via Facebook messenger. There is no evidence that he failed to protect sensitive patient information from unauthorized disclosure, use, identification or destruction. He did not admit to sharing any identifying information that would be considered PHI. (519-521). Rather, Dr. Cook testified that the patient contacted him via Facebook messenger a handful of times after September 2017 requesting a refill of her medication. (490). In response, Dr. Cook advised Patient A to communicate with him via MyHealthVet or to call the clinic directly regarding refills. (491). However, at no time did Dr. Cook use Facebook messenger to communicate with Patient A in a manner that disclosed sensitive information.

For these reasons, the DAB's findings are contrary to the manifest weight of the evidence and the decision must be reversed.

IV.   **THE ACTION IS OVERLY HARSH AND EXCESSIVE IN LIGHT OF THE EVIDENCE AND MITIGATING FACTORS.**

The decision to remove Dr. Cook from federal service and revoke his clinical privileges was overly harsh and excessive in light of the evidence presented during the AIB investigation and at the DAB hearing and mitigating factors that weigh in Dr. Cook's favor.

An agency's penalty determination is reviewed under an abuse of discretion standard. *Schuck v. Frank*, 27 F.3d 194, 197 (6th Cir. 1994). A reviewing court must afford deference to the agency "unless the penalty is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." *Id* (internal citations omitted). The *Douglas* factors guide the determination of whether a penalty is appropriate. *See Douglas v. Veterans Admin*., 5 M.S.P.B. 313, 332 (1981) (listing twelve factors that courts and review boards should use to determine whether a penalty is appropriate). The Court's "review of an agency-imposed penalty is essentially to assure that the agency did conscientiously consider the relevant factors and did strike a responsible balance within tolerable limits of reasonableness." *Douglas*, 5 M.S.P.B. at 332-3.

The DAB's decision to uphold the revocation of Dr. Cook's clinical privileges and his removal from federal employment was an abuse of discretion where there is no indication that it weighed any of the *Douglas* factors. A weighing of the *Douglas* factors, if conducted by the DAB, would have revealed that the penalty was overly harsh and entirely disproportionate to the offense. There was no evidence that Dr. Cook knowingly or intentionally contacted Patient A to start a personal or sexual relationship with knowledge that she was a patient. Rather, the evidence showed that Patient A initiated contact with Dr. Cook; that Dr. Cook was unaware that Patient A was a patient when she initiated contact; and that Dr. Cook did not learn that Patient A was a patient until after they were intimate. As soon as Dr. Cook became aware that she was a patient, he immediately

terminated any further sexual relationship and shortly thereafter, any personal relationship with Patient A.

There have never been similar allegations made against Dr. Cook during his employment with the VA. This was one isolated incident in an otherwise unblemished 15-year career. The two prior disciplinary actions against Dr. Dr. Cook while employed at the VA were both minor and administrative in nature, for not timely completing documentation. (479-80). These actions are entirely unrelated to the present. There were no prior allegations of unprofessional or unethical conduct made against Dr. Cook while he was employed with the VA.

Furthermore, Dr. Cook openly testified to the DAB that he should have proactively requested that Patient A be reassigned to another provider after their encounter on September 11, 2017. (493-495). Dr. Cook's candor clearly demonstrates recognition of his mistake, remorse for his actions, and that he would not engage in similar conduct in the future. Rather than revoking his clinical privileges and terminating his employment, the VA should have imposed lesser disciplinary action such as probation with counseling, education, mentoring, or other activities that would allow for oversight.

Based on an appropriate weighing of the *Douglas* factors, the DAB's decision to revoke Dr. Cook's clinical privileges and remove him from federal employment is not only overly harsh and excessive, but arbitrary and capricious where a rational connection between the facts and the decision cannot be made, and must be reversed.

## **CONCLUSION**

For the reasons set forth above, David Cook, M.D., respectfully prays that the Court award him the relief set forth in his Complaint for Judicial Review and for any further relief this Court deems appropriate.

Dated: May 7, 2020

                                                Respectfully Submitted,
                                                DAVID COOK, M.D.

                                        By:   */s/ Jenna E. Milaeger*
                                                      One of His Attorneys

Jenna E. Milaeger
Michael K. Goldberg
Robert A. Bauerschmidt
Goldberg Law Group, LLC
120 South Riverside Plaza, Suite 1675
Chicago, Illinois 60606
Tel.: (312) 930-5600
Fax: (312) 930-0944
mgoldberg@goldberglawoffice.com
jmilaeger@goldberglawoffice.com
bbauerschmidt@goldberglawoffice.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System, and I hereby certify that a copy of the foregoing document was served by electronic mail, on May 7, 2020, to all counsel of record.

                                                 */s/ Jenna E. Milaeger*
                                                 One of Plaintiff's Attorneys

GOLDBERG LAW GROUP, LLC
120 S. Riverside Plaza, Suite 1675
Chicago, IL 60606
Tel.: (312) 930-5600
Fax: (312) 930-0944
jmilaeger@goldberglawoffice.com